IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) STATE OF OKLAHOMA ex rel. E. Scott Pruitt, in his official capacity as Attorney General of Oklahoma, and<br><br>(2) OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY,<br><br>  Plaintiffs,<br><br>v.<br><br>(1) GINA MCCARTHY, in her official capacity as Administrator of the U.S. Environmental Protection Agency, and<br>(2) U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>  Defendants. | Case No. 15-CV-369-CVE-FHM |

# COMPLAINT

1. This is an action for declaratory judgment and injunctive relief against the *ultra vires* actions of a government officer and agency that are currently inflicting substantial irreparable injury on the State of Oklahoma. Not only do Defendants United States Environmental Protection Agency and Administrator Gina McCarthy claim authority to compel state governments to reorganize their energy economies— in contravention of at least three separate statutory bars and two constitutional

limitations on federal power—but they are already acting to exercise that bogus authority. By "proposing" that states will be required to fundamentally restructure the generation, transmission, and regulation of electricity, and do so at a breakneck pace, Defendants have left states no choice but to begin carrying out EPA's commands at this time, well before any court has an opportunity to review their "final" rule. The entire point of this unprecedented approach is to evade judicial review by forcing states to take burdensome and expensive actions that will be difficult or impossible to reverse even when Defendants' assertion of authority is ultimately rejected—as it inevitably will be. Unless this Court intervenes, Oklahoma will have no meaningful or adequate remedy to enforce the limitations that the Clean Air Act and the Constitution place on the authority of the United States Environmental Protection Agency and its Administrator and to avoid injury to its sovereign, quasi-sovereign, fiscal, and economic interests.

## PARTIES

2. The State of Oklahoma is a State of the United States of America with all rights, powers, and immunities of a State, including the sovereign power over individuals and entities within its jurisdiction and the power to create and enforce legal codes, statutes, and constitutional provisions, and to act pursuant to its police powers. The State of Oklahoma has exercised these powers to create a comprehensive energy regulatory scheme that is administered across several governmental components. By exercising its regulatory authority, the State of Oklahoma has acted to secure for itself and its citizens affordable and reliable generation and transmission of electricity. Coal-fired generation contributes 38 percent of electricity generation in the State.

3. Scott Pruitt, in his official capacity as Attorney General, brings this action on behalf of the State of Oklahoma as chief law officer for the State of Oklahoma. In that capacity, he has a statutory duty to prosecute and defend all

actions and proceedings in any federal court in which the State, including any of its components, is interested as a party. *See* 74 O.S. § 18b(A)(2).

4. The Oklahoma Department of Environmental Quality ("ODEQ") is the State of Oklahoma's primary environmental regulator, responsible for formulating and enforcing air and water quality standards, among other laws, within the State.

5. The State of Oklahoma has an interest in contesting the *ultra vires* actions taken by Defendant McCarthy purportedly under her office as Administrator of the U.S. Environmental Protection Agency because these actions harm the State of Oklahoma's interests by, *inter alia*, requiring the restructuring of the State's energy sector, impairing the functioning of the statutory and regulatory system that ensures Oklahoma's citizens have access to a reliable electric system, undermining the State of Oklahoma's exercise of its police powers in reliance on reliable electric power, compelling the state to expend substantial administrative and bureaucratic resources, compromising investment and tax revenue, and threatening the health and welfare of Oklahoma's citizens by undermining electric reliability and affordability.

6. Defendant Gina McCarthy is Administrator of the U.S. Environmental Protection Agency ("EPA") and is responsible for administering the Clean Air Act ("CAA" or the "Act"). All actions challenged in this case were taken pursuant to McCarthy's direct or indirect orders and under the color of her office.

7. Defendant U.S. Environmental Protection Agency is a federal regulatory agency administered by Defendant McCarthy. "EPA" refers to both the U.S. Environmental Protection Agency and Administrator McCarthy in her official capacity.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Defendants' actions undertaken in asserted reliance on federal law exceed their delegated authority, contravene specific statutory and constitutional

prohibitions, involve enormous waste of governmental resources, purport to require the complete restructuring of the energy industry within the State of Oklahoma, and are currently inflicting substantial irreparable injuries on the State of Oklahoma, for which the State has no other adequate prospect of relief. *See generally Leedom v. Kyne*, 358 U.S. 184 (1958); *Central Hudson Gas & Electric Corp. v. EPA*, 587 F.2d 549 (2d Cir. 1978).

9. The State of Oklahoma and other parties attempted to obtain relief from the EPA Power Plan by filing All Writs Act petitions in the D.C. Circuit pursuant to that Court's decision in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984). The D.C. Circuit dismissed those petitions, holding that the EPA Power Plan was not "final action" pursuant to Clean Air Act Section 307(b), 42 U.S.C. § 7607(b), and that it therefore lacked jurisdiction to consider them. *In re Murray Energy Corp.*, __ F.3d __, Nos. 14-1112, 14-1151, 14-1146, 2015 WL 3555931 (D.C. Cir. June 9, 2015). That decision denying statutory jurisdiction under the Clean Air Act supports this Court's exercise of residual Section 1331 jurisdiction pursuant to *Leedom*. See 358 U.S. at 190–91.

10. CAA § 307, 42 U.S.C. § 7607, does not displace or limit the Court's jurisdiction under 28 U.S.C. § 1331.

11. Venue is proper under 28 U.S.C. § 1391(e)(1).

## BACKGROUND

### A. CAA Section 111(d)

12. The Clean Air Act is founded on the principle of cooperative federalism, with states retaining the primary authority to regulate emissions from sources in their territories. The Act specifically recognizes that "air pollution control at its source is the primary responsibility of States and local governments." CAA § 101(a)(3), 42 U.S.C. § 7401(a)(3).

4

13. CAA § 111(d), 42 U.S.C. § 7411(d), concerns the application of standards of performance to certain existing sources within categories of sources of air pollution that are also subject to new source performance standards under CAA § 111(b).

14. A "standard of performance" is defined as "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the [EPA] Administrator determines has been adequately demonstrated." CAA § 111(a)(1), 42 U.S.C. § 7411(a)(1).

15. In Section 111(d), Congress charged states with establishing standards of performance for certain minor categories of sources for which new source performance standards had already been promulgated, but which are not subject to regulation under Section 112 of the Act and which emit pollutants that are not listed under Section 108 of the Act. Congress expressly authorized states, when establishing these standards and applying them to particular sources, to "take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies."

16. EPA's role under Section 111(d) is limited to creating regulations to establish a "procedure" under which states submit their Section 111(d) implementation plans, disapproving plan submissions that are unsatisfactory, and promulgating federal plans for states that do not submit satisfactory plans.

17. Section 111(d) is subject to a statutory limitation on EPA's authority to call for states to submit Section 111(d) plans. In relevant limitation, that part provides that EPA may not mandate that states establish standards for performance for existing sources that are part of "a source category which is regulated under section [112 of the CAA]."

5

**B.     EPA's Regulation of Coal-Fired Power Plants Under Section 112**

18.     Section 112 of the Act, 42 U.S.C. § 7412, establishes a program regulating emissions of certain "hazardous air pollutants" from certain categories of sources that are included in the Section 112(c) list of source categories.

19.     Although Section 112 permits EPA to list categories of major and area sources of listed hazardous air pollutants, it specifically precludes regulation of "electric utility steam generating units" (i.e., fossil-fuel-fired power plants) unless and until "the Administrator finds such regulation is appropriate and necessary." CAA § 112(n)(1)(A), 42 U.S.C. § 7412(n)(1)(A).

20.     On December 20, 2000, EPA published a notice of its finding that regulation of electric utility steam generating units was appropriate and necessary, adding electric utility steam generating units to the list of regulated source categories under CAA § 112. 65 Fed. Reg. 79,825. EPA's attempt to reconsider that finding was vacated by the D.C. Circuit in *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008).

21.     On February 16, 2012, EPA promulgated a rule pursuant to Section 112 establishing national emissions standards for power plants. 77 Fed. Reg. 9,304. The lawfulness of EPA's "appropriate and necessary" finding that triggered regulation under Section 112 was affirmed by the D.C. Circuit in *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222 (D.C. Cir. 2014). Subsequently, the Supreme Court held that EPA unlawfully failed to consider costs when deciding whether to regulate under Section 112 and remanded the matter to the D.C. Circuit without vacating the rule. *Michigan v. EPA*, __ U.S. __, No. 14-46, 2015 WL 2473453 (June 29, 2015).

22.     Upon exercising its asserted discretion to list electric utility steam generating units as a regulated source category under Section 112 of the Clean Air Act, EPA by operation of law lost authority under Section 111(d) to mandate that states establish standards of performance for existing sources in that category.

### C. The EPA Power Plan

23. On June 18, 2014, EPA proposed a rule to regulate greenhouse gas emissions from existing fossil-fuel-fired power plants pursuant to CAA § 111(d) (the "EPA Power Plan"). 79 Fed. Reg. 34,830. The EPA Power Plan is intended to extend federal authority over all aspects of the production, distribution, and use of electricity, with an aim of reducing carbon-dioxide emissions from the power sector by 30 percent by 2030, relative to 2005 levels. *Id.* at 34,832. It aims to achieve that goal by requiring states to overhaul their "production, distribution and use of electricity."

24. EPA describes its Power Plan as a "plant to plug" approach that comprehensively addresses all aspects of energy production and consumption based on "the interconnected nature of the power sector." EPA Fact Sheet (June 2, 2014), *available at* http://www2.epa.gov/sites/production/files/2014-05/documents/20140602fs-plan-flexibilty.pdf; 79 Fed. Reg. at 34,845. EPA stated its position that "anything that reduces the emissions of affected sources may be considered a 'system of emission reduction'" for purposes of Section 111. 79 Fed. Reg. at 34,886.

25. The EPA Power Plan identified four means of reducing carbon-dioxide emissions from the power sector, which it calls "building blocks." These building blocks recognize that, to implement the "best system of emission reduction," states will have to (1) require power plants to make changes to increase their efficiency in converting fuel into energy, (2) replace coal-fired generation capacity with increased use of natural gas, (3) replace fossil-fuel-fired generation with nuclear and renewable sources, such as wind and solar, and (4) mandate more efficient use of energy by consumers.

26. The EPA Power Plan specifies numerical "emission rate-based $CO_2$ goals" for each state. 79 Fed. Reg. at 34,833. These rate-based goals are based on

projected emissions reductions that EPA believes can be achieved through the combination of the four "building blocks" that it says represent a baseline "best system of emission reduction." Accordingly, the "goals" differ from state to state.

27. The EPA Power Plan requires states to submit state plans to achieve interim and final goals that EPA has specified for each state.

28. The EPA Power Plan's "building blocks," in one combination or another, are the only ways that a state could reorganize its electric generating capacity to achieve the targets set by EPA.

29. The EPA Power Plan relies almost entirely on "beyond-the-fenceline" measures—that is, regulation of things other than the categories or subcategories of sources that it has listed for regulation under Section 111(d). States have no choice but to undertake such "beyond-the-fenceline" measures to achieve the targets set by EPA.

30. EPA recognizes that states will be required to undertake such "beyond-the-fenceline" measures. In testimony before Congress, Administrator McCarthy stated that EPA's plan is "really . . . an investment opportunity. *This is not about pollution control*. . . . It's about investments in renewables and clean energy."

31. EPA and Administrator McCarthy have determined that they possess the legal authority to regulate in the manner laid out in the EPA Power Plan and that such regulation is appropriate. They have determined to promulgate a final rule that maintains the goal of reducing carbon-dioxide emissions from the power sector by 30 percent by 2030, relative to 2005 levels; that maintains the "building block" approach and the specific "building blocks"; and that requires states to submit state plans to achieve state-specific goals based on the "building blocks."

32. These determinations are reflected in the rule that EPA delivered to the Office of Management and Budget on June 3, 2015.

33.     EPA has stated that it intends to take official final action on its Power Plan in late August. In reality, EPA's action already imposes substantial obligations on regulated entities—the states.

### D.     The EPA Power Plan Requires Oklahoma To Restructure Its Energy Sector

34.     Although states are, in principle, free to achieve the goals established by the EPA Power Plan in any manner, or to decline to submit a state plan and allow EPA to promulgate a federal implementation plan, achieving the goals without plunging the states' electric supply system into chaos and threatening continuity of electric service will require wholesale restructuring of states' electricity sectors. This is true of Oklahoma, which will suffer all of the following burdens.

35.     An electric system consists of numerous sources of electricity connected to consumers through a transmission grid. To ensure that electric service is reliable, the supply of electricity across all electricity generating sources must exceed the highest possible demand among all consumers. In order to maintain reliability and to provide electricity at a low cost to consumers, state regulation controls the order in which particular sources are "dispatched" to meet demand. In general, large coal-fired facilities, which provide affordable and reliable power, operate 24 hours per day year-round, barring maintenance outages, to satisfy "base load" demand. Smaller, more-expensive generators (often powered by natural gas) operate on a fairly regular schedule to meet cyclical demand and are often called "cycling" units. Older and less efficient coal- and gas-fired units operate during times of particularly high demand, such as hot summer days, to satisfy "peaking" demand. The order in which sources are dispatched generally depends on such factors as cost, transmission capacity, and the characteristics of local generating units. The percentage of a generation source's total capacity that is actually used over a period of time is its "utilization rate."

36. States will be required to revise statutory and regulatory systems that govern dispatch among power plants to reduce the use of coal-fired power plants, even though these plants typically supply base load power in state energy systems. That change, in turn, will require additional state actions to ensure that customers in areas relying on coal-fired plants are not left without power or forced to bear unreasonable costs. It will also require substantial changes to utility regulation systems that put cost and reliability first in dispatch determinations.

37. States will be required to revise statutory and regulatory systems that govern dispatch among power plants to increase the utilization rates of natural gas-fired power plants, even though maintaining what appears to be "excess" capacity is essential to integrating renewable energy sources into the grid.

38. States will be required to develop or incentive zero-emissions generation, which will require authorizing legislation and expenditures. Developing sources of alternative energy will also require that state regulators take action to integrate those sources into the grid. It will also inevitably implicate other environmental requirements, such as endangered-species protection, that states must address at considerable burden and expense.

39. States must address how increased renewable-energy capacity, which may fluctuate, fits into the transmission system and dispatch, as well as how such capacity will be compensated. In states where it is not feasible to add renewable capacity, or that do not receive credit for such capacity that is exported, other measures will be required, such as participation in interstate programs for the purchase and sale of energy, typically requiring new statutory authority, significant groundwork in negotiating compacts between and among states, creation of a multi-state entity to administer the program, and time to accomplish all of this.

40. States must enact programs to reduce electricity demand in an enforceable fashion, requiring legislative and regulatory action. States with

deregulated or partially deregulated electricity markets will face particular challenges because power plants may be independent of power distribution companies.

41.     Achieving the goals of the EPA Power Plan will also require direct regulation of consumers of electricity, which will be a new mission for state environmental and utility regulators.

42.     Inevitably, states will be required to force the owners of coal-fired power plants to retire those units, resulting in substantial challenges to maintaining electric service for all customers, ensuring that plant operators are appropriately compensated, and ensuring that the financial impact on electricity consumers is acceptable.

43.     In sum, the EPA Power Plan will require states to overhaul their regulation of electricity and public utilities and to take numerous regulatory and other actions to comply with and accommodate the Proposed Rule while maintaining electric service, let alone affordability and reliability.

44.     And that will be the case even for states that take no direct action and become subject to a federal plan, due to states' pervasive regulation of state power systems, transmission, and utilities.

45.     EPA lacks the authority to undertake regulation of state power systems, transmission, and utilities, even though carrying out its Power Plan will require the exercise of such regulatory authority. Accordingly, the EPA Power Plan will require states to exercise such regulatory authority, whether or not they submit state plans.

**E.     The EPA Power Plan Is Currently Causing Oklahoma Irreparable Harm**

46.     Planning for power plants, transmission, and other aspects of electric generation and transmission is an intensive, years-long process. It can take six years or more from the time that the need for a new transmission project has been

11

identified to the time that it is placed into service. Likewise, power plants take years to plan, construct, and integrate into the grid.

47. Such planning is undertaken by the State of Oklahoma in conjunction with utilities, the Southwest Power Pool, and other entities.

48. Energy regulation in the State of Oklahoma is primarily the responsibility of the Oklahoma Corporation Commission ("OCC"), an independent regulatory agency created in 1907 that regulates rates charged and services provided by investor-owned electric utilities and reviews triennial integrated resource plans that the utilities submit. The Commission also regulates the exploration, production, storage, distribution, and intrastate transportation of oil and gas. The Oklahoma Municipal Power Authority regulates utilities operated by local governments within the State. The Oklahoma Department of Environmental Quality ("ODEQ") is charged with implementing and enforcing the State's various environmental regulatory programs, including those relating to the Clean Air Act. The Secretary of Energy and Environment is responsible for oversight and coordination of the state's energy and environmental authorities and for assisting in the development of the state's overall energy and resource policy. Finally, the Energy Office within the state's Department of Commerce promotes renewable energy and energy efficiency. Within the limits of the authorization of the Oklahoma Legislature, these governmental entities administer a comprehensive regulatory scheme for Oklahoma's power sector.

49. According to the U.S. Energy Information Administration, coal-fired facilities located within Oklahoma generated 29,301,758 megawatt hours of power in 2012. That accounts for more than 37 percent of all power generated within the State in 2012.

50. The EPA Power Plan sets a goal of 35.5 percent reduction in power-plant greenhouse gas emissions for Oklahoma by 2030. It also sets an "interim goal" of 33 percent by 2020.

51. Nowhere near a 33-percent, much less a 35.5-percent, reduction in emissions can be achieved through "inside-the-fenceline" emission-control measures that are achievable at those units.

52. The only way that a 33-percent reduction in emissions could occur by 2020 would be through the mass retirement of coal-fired plants.

53. Even EPA recognizes that "inside-the-fenceline" efficiency improvements are insufficient to achieve the goals it set for the State of Oklahoma. EPA projects that improvements in coal-plant efficiency will be able to yield only negligible reductions in carbon-dioxide emissions. Accordingly, EPA recognizes that shuttering coal plants and/or "beyond-the-fenceline" measures will be required for Oklahoma to achieve EPA's goals.

54. Even with "beyond-the-fenceline" measures that may somewhat ease the need for retirements, EPA projects that the EPA Power Plan will cause an increase of approximately 200 percent in retiring generating capacity in and around Oklahoma relative to current expectations. In other words, even if the State of Oklahoma accedes to EPA's coercion and commandeering and agrees to regulate its own citizens in the manner that EPA has specified, the State will still see substantial reductions in generating capacity that require it to take further regulatory measures to ensure electric reliability.

55. Whether the State of Oklahoma adopts a state plan to meet EPA's goals or EPA promulgates a federal implementation plan, the EPA Power Plan forces the State of Oklahoma to undertake substantial legislative, regulatory, planning, and other activities.

56. The State of Oklahoma's regulatory agencies lack statutory authority to carry out the second, third, and fourth of EPA's "building blocks." Doing so therefore requires legislative authorization and then implementing regulations.

57. Integrating new renewable energy sources into the grid will require substantial State effort, over a period of years, regarding planning, permitting, and construction.

58. Increasing the dispatch of natural gas-fired power plants will also require extensive planning and regulatory activities, as well as permitting and construction of new facilities, over a period of years. Current excess capacity in Oklahoma's existing natural gas plants is required to accommodate the variable nature of renewable sources like wind and solar.

59. Likewise, adding additional renewable sources will also require planning, permitting, and constructing additional natural gas or other traditional sources to account for variable production.

60. In sum, due to the EPA Power Plan, simply maintaining electric service across the State of Oklahoma requires substantial expenditures of time, effort, and money by the Oklahoma Legislature, OCC, ODEQ, and other state actors, as well as private utilities. These expenditures cannot be recouped. If the State does nothing while EPA implements anything like a 35.5-percent reduction in carbon-dioxide emissions from Oklahoma's coal-fired power plants, the lights will go out in many Oklahoma communities, impacting State governmental operations, as well as the health and welfare of citizens. The same is true of the 33 percent "interim goal" set by EPA and would be true of even a substantially smaller goal, on the order of 15 or 20 percent.

61. These activities cannot be undertaken in anything like the EPA Power Plan's timeline, which allows states only five years or less to meet "interim goals." At a minimum, the State of Oklahoma will require eight years to undertake the

activities that are required to maintain electric service. Accordingly, carrying out the EPA Power Plan requires that state officials engage in planning, regulatory, and other activities in advance of a nominally final rule.

62. Many of these activities are irreversible and/or cause the State of Oklahoma irreparable injury. For example, devoting administrative manpower to activities required by the EPA Power Plan prevents the State from undertaking other activities in its sovereign capacity. Being forced by the federal government to change its own laws and to exercise aspects of its police power subjects the State of Oklahoma to *per se* sovereign injury. Actions taken now and decisions made now—for example, committing to new projects necessary to maintain electric service—will cost the State of Oklahoma money and manpower in the years ahead.

63. Once the EPA Power Plan is finalized—but not until it is finalized—Oklahoma will have recourse to challenge it in the D.C. Circuit by means of a petition for review of EPA's final action under Section 307 of the Clean Air Act. Oklahoma can reasonably expect that it will take, at minimum, nine months from the time the petition is filed to the time the D.C. Circuit will issue a final decision invalidating the Proposed Rule. It may take much longer.

64. Even if Oklahoma is able to obtain a stay of the EPA Power Plan in the D.C. Circuit, that is still likely to take months.

65. By that time, Oklahoma will have either implemented or taken irreversible steps towards implementing most, if not all, of the changes described above, meaning that they will be implemented even though the EPA Power Plan is certain to be invalidated.

66. The ordinary petition process under Section 307 is not an adequate means of obtaining the relief required if Oklahoma is to maintain its power sector in anything like the form it exists today and if it is to forgo the massive expenditure of resources required to accommodate the EPA Power Plan. The EPA Power Plan will

result in the complete restructuring of Oklahoma's power sector even though it has no chance of surviving eventual judicial scrutiny.

### F. The EPA Power Plan Is Plainly *Ultra Vires*

67. The EPA Power Plan plainly exceeds EPA's authority under the Clean Air Act and the authority of the Federal Government under the United States Constitution in at least five separate respects.

68. First, the EPA Power Plan violates the provision of Section 111(d) that precludes EPA from requiring states to establish existing source standards of performance for sources that are part of "a source category which is regulated under section [112 of the CAA]" because EPA has already acted to regulate coal-fired power plants under Section 112.

69. Second, the EPA Power Plan's "building block" approach is not a permissible "best system of emission reduction" under Section 111, particularly due to the serious constitutional doubt caused by EPA's interpretation of that term.

70. Third, the EPA Power Plan's rigid numerical goals for each state, based on its existing sources, violates Section 111(d)'s mandate that EPA allow states to "take into consideration . . . the remaining useful life of the existing source to which such standard applies."

71. Fourth, as described above, the EPA Power Plan unlawfully commandeers the states, in excess of Congress's Article I authority and in violation of the Tenth Amendment to the U.S. Constitution.

72. Fifth, the EPA Power Plan unlawfully coerces the states, in excess of Congress's Article I authority and in violation of the Tenth Amendment to the U.S. Constitution, by threatening to withhold states' highway funding, to impose substantial injuries on states' citizens, and to severely impair states' exercise of their police powers if they do not comply with EPA's demands.

## CLAIMS FOR RELIEF

### COUNT I: DECLARATORY RELIEF

73. Paragraphs 1 through 72 are incorporated herein by reference as if set forth in full.

74. An actual controversy exists between Defendants and the State of Oklahoma regarding the lawfulness of the EPA Power Plan under the Clean Air Act and United States Constitution.

75. The State of Oklahoma is entitled to a declaration of its rights under the Clean Air Act and United States Constitution pursuant to 28 U.S.C. §§ 2201 and 2202.

### COUNT II: INJUNCTIVE RELIEF

76. Paragraphs 1 through 72 are incorporated herein by reference as if set forth in full.

77. The State of Oklahoma has a strong likelihood of success on the merits of this case because Defendants' action is plainly unlawful and the State lacks any meaningful and adequate opportunity for judicial review in light of the enormous waste of governmental resources and the continuing threat of a complete restructuring of an industry, as well as other injuries, caused by Defendants' action.

78. The State of Oklahoma is suffering irreparable injury as a result of Defendants' unlawful actions. Defendants' interference with state statutes, violation of the State's constitutional rights through commandeering and coercion, and interference with the exercise of the State's police power all constitute *per se* irreparable harm. The State is also injured by the substantial expenditure of state resources, injuries to its citizens and economy, and abrogation of its legitimate policymaking discretion for years into the future.

79. Defendants will suffer no injury at all if they are enjoined.

80. An injunction would serve the public interest, by preventing violation of the United States Constitution and abrogation of state sovereignty and avoiding substantial economic injury and job loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray the Court grant them the following relief:

A. A declaration that the EPA Power Plan violates the Clean Air Act, that Defendants lack authority to regulate coal-fired power plants under Section 111(d) of the Clean Air Act, that Defendants lack authority to directly or indirectly prescribe "outside-the-fenceline" measures under Section 111(d), and that the EPA Power Plan exceeds Congress's Article I authority and violates the Tenth Amendment to the U.S. Constitution;

B. A preliminary injunction forbidding Defendants from regulating coal-fired power plants under Section 111(d) of the Clean Air Act and from taking any action to enforce the EPA Power Plan;

C. A permanent injunction forbidding Defendants from regulating coal-fired power plants under Section 111(d) of the Clean Air Act and from taking any action to enforce the EPA Power Plan; and

D. Such other relief as the Court deems just and proper.

Respectfully submitted,

DAVID B. RIVKIN, JR.*
LEE A. CASEY*
MARK W. DELAQUIL*
ELIZABETH PRICE FOLEY*
ANDREW M. GROSSMAN*
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20002
(202) 861-1731
drivkin@bakerlaw.com

/s/ E. Scott Pruitt
E. SCOTT PRUITT, OBA #15828
ATTORNEY GENERAL OF OKLAHOMA
PATRICK R. WYRICK, OBA #21874
SOLICITOR GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-4396
(405) 522-0669 (facsimile)

*Application for admission *pro hac vice* pending

Service email:
fc.docket@oag.state.ok.us
Scott.Pruitt@oag.ok.gov

*Attorneys for Plaintiffs*